IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| MARLANA FINDLEY, *et al.,* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CASE NO. 2:11-cv-169-MEF |
| | ) (WO) |
| CITY OF MONTGOMERY, | ) |
| | ) |
| Defendant. | ) |

# **ORDER**

This cause is before the Court on Defendant City of Montgomery's Motion for Summary Judgment, Doc. #33, and Plaintiffs' Motion for Partial Summary Judgment, Doc. #23.  For the reasons discussed below, Defendant's motion is due to be **GRANTED** and Plaintiffs' motion is due to be **DENIED**.

## **I. Jurisdiction and Venue**

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a).  The parties do not assert that this Court lacks personal jurisdiction over them, and there is no dispute that venue is proper pursuant to 28 U.S.C. § 1391(b). Additionally, the Court has pendent jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

1

## II.  Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quotation omitted).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

If the movant satisfies its evidentiary burden, the non-moving party must then establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); Fed. R. Civ. P. 56(c).  What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also Lofton v. Sec'y of*

*the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation and internal quotation marks omitted).

A genuine dispute as to a material fact can only be found "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Greenberg*, 498 F.3d at 1263. However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 242 (citations omitted). Likewise, "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment[,]" *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Furthermore, a nonmoving party's "conclusory allegations . . . in the absence of supporting evidence, are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); *see also Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact . . . .") (emphasis in original).

3

When a nonmovant fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

On summary judgment, the facts must be viewed in the light most favorable to the non-movant. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Hence, "'facts as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'" *Id.* (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

### III. Factual Background

The submitted evidence, construed in the light most favorable to the non-moving party, establishes the following facts.

Marlana Findley, Hannah Powell, and Ruthanne Spackman ("Plaintiffs") are three women above the age of nineteen residing in Elmore County, Alabama. Doc. #30 at 1. On or about May 16, 2010, officers with the Montgomery Police Department arrested Plaintiffs, along with three men who were with Plaintiffs, for criminal trespass under Ala. Code §13 A-7-4. Plaintiffs and their male companions were allegedly in Vaughn Road Park after the park was closed. Doc. #33-1. The arresting officers took Plaintiffs and the three men to the

Montgomery Police Department, where Plaintiffs waited for a city magistrate to prepare an arrest warrant and set bond for each of the Plaintiffs.  Doc. #34 at 2-3.  Plaintiffs were eventually taken to the booking section of the Montgomery Municipal Jail—located in the same building as the police department—where Montgomery Municipal Jail Corrections Officer Santana Harris ("Harris") strip-searched Plaintiffs in preparation for Plaintiffs to be placed in the jail's general population.  Doc. #30 at 3; Doc. #39-11 at 82-84.  Montgomery Municipal Jail Corrections Officer Wilkins ("Wilkins") was responsible for searching the men.  The men were not strip-searched, but were placed in the jail's general population.  Doc. # 34 at 3.

At the time Plaintiffs were strip-searched, the search policy at the Montgomery Municipal Jail  read: "It is the policy of the Montgomery Municipal Jail to minimize the introduction, circulation, and use of contraband in this facility.  All inmates entering the Municipal Jail are given unclothed body searches." Doc. #33-9.  The parties agree that there was no reasonable suspicion that any of the Plaintiffs had hidden contraband on their persons or were trying to bring any sort of contraband into the jail.  Doc. # 30 at 4.  Wilkins, who failed to strip-search Plaintiffs' male companions, was disciplined by the Police Department and suspended.  Doc. #33-2 at 2.

While Plaintiffs were being booked into the jail, Plaintiffs' friends and relatives were working with Alabama Bonding, a bail bond company, to secure an appearance bond for each of the Plaintiffs.  Docs. #39-4, -5, -6.  The bonds for each Plaintiff were received in the

5

magistrate's office at 2:11 A.M. and completed by the magistrate at 2:14 A.M. Doc. #34 at 4. Plaintiffs were released from jail on the bond between 3:49 A.M. and 3:52 A.M. *Id.*

There is little disagreement between the parties as to the events surrounding the arrest, search, and eventual release of the Plaintiffs. The parties disagree, however, on the amount of discretion the aforementioned policy, Doc. #33-9, provided to Montgomery Municipal Jail Corrections Officers in determining who would be subjected to a strip search.

In addition to the written policy set out above, the Municipal Jail also had a less formal, unwritten policy regarding the treatment of inmates who came into the jail with "bond in hand."[1] Having bond in hand means that an individual posts bond, and the bondsman then takes the bond to the magistrate. The magistrate processes the bond and gives the individual a receipt showing that bond has been posted, which the individual carries with him to booking. Doc. #39-10 at 35-36. A person might come into the jail with his "bond in hand" where that person had

> outstanding arrest warrants for any number of reasons; e.g. failure to appear in court, capias warrant for unpaid fines, arrest warrant based [on] execution of a complaint signed by a victim in the magistrate's office. If such persons are aware that they have outstanding warrants, they can go to a bonding company and have the bonding company contact the magistrate's office to determine the charge so that they can complete all the paperwork necessary to post bond. The individual can then turn himself into the jail with the warrant

---

[1] Deposition testimony indicates that while a majority of jail personnel were aware of a policy dictating that they were not required to search individuals entering the jail with bond in hand, this policy was passed on, at least primarily, through training and word of mouth. *See, e.g.,* Doc. #39-10 at 46-48 (indicating that deponent was told by a "fellow employee" about the policy of not searching individuals with bond in hand); Doc. #39-14 at 11 (indicating that deponent had been given oral instructions about bond-in-hand search procedure and recollected reading something about the procedure but could not remember "where that was").

> and bond paperwork in hand. At that time, the jail assigns an officer to the individual, the officer conducts a pat down search and escorts the individual to the fingerprinting area. He is fingerprinted and released. These individuals are always accompanied by an officer and do not have any contact with inmates in general population. Therefore, there is no reason to perform a strip search on these individuals.

Doc. #34 at 6; *see also* Doc. #39-14 at 11-12 (indicating that individuals with bond in hand were not generally placed in jail's general population). The Court will hereafter refer to individuals entering the jail with their "bond in hand" as "bonded" individuals.

At the time of the incident at issue here, the policy in place for dealing with bonded individuals (the "as-implemented policy") was "they were kept and paired with an officer, fingerprinted, [and] brought back to the booking office for release." Doc. #39-16 at 12. Deposition testimony indicates that there was no reason to perform a strip search on an individual who would not be booked into general population, Doc. #39-13 at 17, and, under this as-implemented policy, jail employees were not required to search bonded individuals. Jail employees did have discretion to search bonded individuals, and could do so based on either probable cause, Doc. #39-13 at 14-15, or simply because the jail officials were so inclined. Doc. #39-16 at 17-18. However, under circumstances that necessitated placing a bonded individual in general population, that individual was strip-searched. Doc #39-13 at 17; Doc. #39-17 at 20. These circumstances arose when jail personnel were too busy to process the bonded individual quickly and could not keep the individual in a temporary holding cell for an indefinite period of time. Doc. #39-13 at 17; Doc. #39-17 at 20.

7

IV. Discussion

**A. Plaintiffs Have Not Shown a Constitutional Violation Sufficient for Municipal Liability Under § 1983.**

Plaintiffs allege that the as-implemented policy and the search Plaintiffs were subject to under the policy violated Plaintiffs' Fourth Amendment rights. Plaintiffs and Defendant agree that "local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dept. of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). Thus, Plaintiffs can succeed in their § 1983 claims against the City of Montgomery by showing "(1) that [their] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right, and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Plaintiffs have presented enough evidence to show that there was a custom or policy of exempting bonded individuals from the jail's strip-search procedures. This custom or policy would be sufficient to establish municipal liability if Plaintiffs could prove, as required by *McDowell*, that their constitutional rights were violated, that the as-implemented strip-search policy constituted deliberate indifference to that constitutional right, and that the as-implemented policy caused the violation. Here, however, Plaintiffs have failed to show a violation of a constitutional right, and thus the City of Montgomery cannot be held liable.

**B. Defendant's As-Implemented Search Policy Requires Searching All Individuals Entering the Jail's General Population, and Is Not Materially Different From the Search Policy Upheld in *Powell v. Barrett*.**

There are two issues that need to be resolved in order to rule on the parties' cross-motions for summary judgment on the Fourth Amendment issue. One issue is a question of fact, the other is a question of law. The question of fact is whether employees in the Montgomery Municipal Jail had sufficient discretion under the jail's as-implemented search policy that they could choose not to search individuals who were to be placed in the jail's general population. Once that question is answered, the question of law the Court must address is whether the as-implemented search policy is materially different from the search policy the Eleventh Circuit upheld in *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008), so as to constitute a violation of the Fourth Amendment.

**1. Jail Officials Did Not Have Discretion to Exempt Individuals, Even Bonded Individuals, From Strip-Search if That Individual Was to Be Placed in the Jail's General Population.**

In their Motion for Partial Summary Judgment, Doc. #23, and their Response to Defendant's Motion for Summary Judgment, Doc. #39, Plaintiffs imply, without explicitly stating, that the as-implemented policy allowed jail personnel to place individuals in the jail's general population without first strip-searching those individuals. Defendant, meanwhile, argues that bonded individuals "are always accompanied by an officer and do not have any contact with inmates in general population. Therefore, there is no reason to perform a strip search on these individuals." Doc. #34 at 6. Defendant further notes, in its reply to

9

Plaintiffs' response, that "[a]ll employees of the Montgomery Municipal Jail who were deposed testified unequivocally that anyone who was placed in the general population of the jail was strip searched." Doc. #42 at 3. The Court resolves this factual dispute in favor of Defendant.

In *Powell*, the Eleventh Circuit held that, where a strip search is undertaken pursuant to a "policy or practice of strip-searching all arrestees as part of the process of booking them into the general population of a detention facility, even without reasonable suspicion to believe that they may be concealing contraband," 541 F.3d at 1300, such a search is not violative of the Fourth Amendment so long as the search at issue is less intrusive than the search at issue in *Bell v. Wolfish*, 441 U.S. 520 (1979).[2] In light of this holding, a policy that requires strip-searching of all individuals entering general population is much more likely to be constitutional under *Powell* than a policy that allows for discretionary searching of general population detainees. Therefore, this Court must determine whether the as-implemented policy at the Montgomery City Jail required that all individuals booked into the general population of the facility be strip-searched. Based on the evidence discussed below, the Court concludes that the as-implemented policy does require that all individuals entering the jail's general population be strip searched.

In their motion for partial summary judgment, Plaintiffs state that bonded individuals were "specifically exempted from being strip-searched as part of the booking process despite

---

[2] Plaintiffs here do not argue that the search they were subjected to was more intrusive than that at issue in *Bell*. Therefore, the Court need not consider that argument.

the fact that these persons were required to be *booked into the jail the same as all the others*." Doc. #23 at 9 (emphasis added). Based on the evidence submitted by both parties in support of their cross-motions for summary judgment, the statement that bonded individuals were not searched but were booked into the same jail as all the others is, at best, semantic stretching, and, at worst, a misrepresentation of the facts.

Additionally, in their response, Plaintiffs state that the as-implemented policy "specifically exempted those individuals who arrived at booking with bond paperwork in hand from being strip-searched, subject to the on-duty detention officer's discretion to strip-search these individuals if he/she so chose, despite the fact that on occasion these persons were placed into the general population." Doc. #39 at 9.

By these arguments, Plaintiffs imply that individuals were placed into the jail's general population without being strip-searched. However, there is no evidence to support this position. In fact, there is deposition testimony to explicitly contradict this assertion.

It is true that bonded individuals were "booked into the jail" as that phrase is understood by jail personnel. See, e.g. Doc. #39-10 at 34-37 (describing jail procedure for moving bonded individuals through jail's "booking section" before bonded individuals were released). This means bonded individuals were processed through jail intake procedures such as fingerprinting and collection of medical information when they arrived at the jail. *Id.*; Doc. #23-9 at 71-72. However, bonded individuals were not typically "booked into the jail" in the sense of being added to the jail's general population. *See, e.g.* Doc. #39-10 at 34-37.

All testimony on this subject indicates that bonded individuals were only rarely placed in general population, Doc. #39-13 at 17, and that when bonded individuals were placed in general population, usually because of delays in processing, these individuals were strip-searched.  Doc. #42-2 at 30, Doc.#39-17 at 20.  This is established in the following record excerpts.

### a. Deposition of Officer Santana Harris

Harris, the officer who strip-searched Plaintiffs, several times refers to her familiarity with individuals with bond in hand "not being strip searched and being released on bond," but nowhere states what happens when a bonded individual has to be placed in the jail's general population, as is described by other deposition witnesses. Doc. #39-10 at 31-32, 34.[3]

### b. Deposition of Montgomery Municipal Jail Sergeant Steve Smith

Smith, a supervisor at the municipal jail, testified to the existence of the as-implemented policy: "if you're being processed in, we strip search . . . . If you come in with a bond in hand, you do not. We do a pat search and continue the releasing process since we have the paperwork in hand." Doc. #39-13 at 7-8.  Smith also indicated that a correctional officer could search a bonded individual "[i]f [the officer] felt probable cause[.]" *Id.* at 14-

---

[3] Harris also indicated that she had known about this policy "since [her] first day," Doc. #39 at 11, and that if she chose to strip search individuals entering the jail with bond in hand, that was "acceptable as far as the policies, procedures, and rules at the jail." *Id.*  However, the fact that the as-implemented policy provided jail personnel with discretion to search bonded individuals is not relevant to the Court's inquiry.

15. More importantly, Smith testified that bonded individuals are generally placed in a holding cell, as distinguished from the jail's general population, while awaiting processing and release. Doc. #39-13 at 11-12. This means that, contrary to Plaintiffs' position, these individuals are not placed in the jail's general population. Smith explains the reason for this custom, "they already have their paperwork in hand, there's no probable cause to strip-search them. They are pat searched. So a body search was not necessary at that point. They're not being dressed out into jail and issued clothes . . . *those persons wouldn't go into general population*." Doc. #39-13 at 17 (emphasis added).

Finally, Smith cites one reason that a bonded individual would be "dressed out and put in the general population." *Id*. He says, "the only reason that would happen is if you came in and . . . we were so busy that a holding cell was not available." *Id*. Smith also testified that "[w]e've had situations where the . . . magistrate will tell us: 'We're working on the paperwork, we'll send it up soon. We'll put the person . . . in the holding cell after they're pat searched, if it takes a while, *we have to undress them and do an unclothed body search and go ahead and process them and place them in general population at that time*." Doc. #42-2 at 30. Smith's testimony clearly indicates that any bonded individual who was placed in general population was strip-searched.

### c. Deposition of Montgomery Municipal Jail Sergeant A.D. Allen

Allen's testimony is consistent with Smith's. As to when a bonded individual might be strip searched, Allen testified, "the officer that pats them down and [if] they're not busy

at the time and they can go ahead . . . they can go ahead and search them and everything, take them back to the back and process them." Doc. #39-17 at 19. When asked what would happen if the booking officer was not ready to "process them out," Allen responded that "if it's going to be a while, like if they come in and we'll just go ahead and dress them out, secure them . . . until we can get to them." *Id.* at 20. Like other deposition witnesses, neither Smith nor Allen indicated that they had any knowledge of an individual, bonded or not, ever being placed into general population without first being strip-searched.

Based on the testimony of Harris, Smith, and Allen, and the absence of any evidence suggesting otherwise, the Court concludes that all individuals processed into the Montgomery Municipal Jail's general population were strip-searched under the as-implemented policy. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.").

**2. The Jail's Strip-Search Policy, As Implemented, Is Not Materially Different From the Policy Upheld As Constitutional in *Powell v. Barrett*.**

The policy at issue in *Powell* dictated that "[e]very person booked into the Fulton County Jail general population [be] subjected to a strip search conducted without an individual determination of reasonable suspicion to justify the search, and regardless of the crime with which the person is charged." *Powell v. Barrett*, 541 F.3d 1298, 1301 (11th Cir.

2008). The Eleventh Circuit held that neither this policy nor any searches conducted under it were violative of the Fourth Amendment. The as-implemented policy at issue in this case provides for the same blanket search of general population detainees as the policy at issue in *Powell*. As such, the fact that jail personnel had discretion as to whether or not to search bonded individuals who were not placed in the general population does not constitute a material difference that distinguishes the policy at issue here from the policy upheld in *Powell*.[4]

In upholding the blanket-search policy at issue in *Powell*, the Eleventh Circuit noted that the Supreme Court's opinion in *Bell v. Wolfish* "instructed us that jailers and corrections officials 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and to maintain institutional security.'" *Powell*, 541 F.3d at 1311 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). In holding that a blanket strip-search policy applied to those arrested for misdemeanors just as it applied to those arrested for felonies, the Eleventh Circuit discussed other appellate court decisions to the contrary, noting that these "[d]ecisions that carve out misdemeanor arrests at county facilities for special treatment do not afford those who run detention facilities the 'wide-ranging deference' the Supreme Court has mandated." *Powell*, 541 F.3d at 1311.

If this Court were to hold unconstitutional the Montgomery Municipal Jail's as-

---

[4] The Court will not consider the application of the jail's as-implemented policy to bonded individuals, as Plaintiffs here did not enter the jail with their bonds in hand.

implemented policy of strip-searching all individuals placed in the jail's general population while not strip-searching individuals who were not placed in general population, this Court too would be guilty of not according the requisite deference to those who run detention facilities. The policy here, like the policy at issue in *Powell*, requires all inmates entering the general population to be strip-searched. *Powell* does not address the treatment of inmates who would not be placed in general population, and this Court cannot hold that exempting these individuals from being strip-searched, or even allowing for the discretionary search of these individuals, constitutes a materially significant legal difference that would serve to distinguish the policy at issue here from the one at issue in *Powell*.

Additionally, it is entirely reasonable for jail personnel to differentiate between arrestees who are to be placed in the jail's general population and individuals who enter the jail with the necessary bond paperwork in hand and are subsequently booked and released. This is an allocation of resources entirely within the discretion of jail officials, and is exactly the sort of internal policy entitled to deference under the Supreme Court's holding in *Bell*. As the *Bell* Court notes, "the realities of running a corrections institution are complex and difficult, courts are ill equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legislative Branches, not to the Judicial Branch." *Bell*, 541 U.S. at 547 n.29.

For the reasons discussed above, Defendant's motion for summary judgment on Plaintiffs' Fourth Amendment claim is due to be granted and Plaintiffs' Motion for Partial Summary Judgment is due to be denied.

**3. State law claims are due to be dismissed.**

Pursuant to 28 U.S.C. § 1367(a), in any civil action in which a federal district court has original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. Pursuant to § 1367(c), however, a district court may decline to exercise such supplemental jurisdiction if the district court has dismissed all claims over which it had original jurisdiction.

In *Palmer v. Hosp. Auth. of Randolph Co.*, the Eleventh Circuit held that whenever a federal court has supplemental jurisdiction under section 1367(a) that jurisdiction should be exercised unless section 1367(b) or (c) applies. 22 F.3d 1559, 1569 (11th Cir.1994). When § 1367(c) permits a court to decline to exercise its jurisdiction, the court's discretion should be guided by the factors described in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-27 (1966). The *Palmer* Court summarized the *Gibbs* factors as follows: judicial economy, convenience, fairness to the parties, and comity. *Palmer*, 22 F.3d at 1569. Typically, where federal claims are dismissed before trial, these factors will favor dismissal of the state claims. *See e.g.*, *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988); *Gibbs,* 383 U.S. at 726; *Bagggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352-53 (11th Cir.1997).

The state law claims remaining in this action are best resolved by the Alabama state courts. The remaining claims raise issues of state law only and do not implicate federal interests in any manner.

For the reasons discussed above, it is hereby ORDERED that:

1) Plaintiffs' Motion for Partial Summary Judgment, Doc. #23, is DENIED;

2) Defendant's Motion for Summary Judgment, Doc. #33, is GRANTED;

3) Supplemental jurisdiction over Plaintiffs' state law claims is DECLINED.

The Court will enter a separate final judgment consistent with this Memorandum Opinion and Order.

Done this the 29th day of November, 2011.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE